James C. Shah
Natalie Finkelman Bennett
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 858-1770
Facsimile: (856) 858-7012
*jshah@sfmslaw.com*
*nfinkelman@sfmslaw.com*

Counsel for Plaintiff

[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| OWEN HAYNES, On Behalf of Himself and All Others Similarly Situated, | CIVIL ACTION NO. |
| Plaintiff, | CLASS ACTION |
| vs. | JURY TRIAL DEMANDED |
| CSX TRANSPORTATION, INC., NORFOLK SOUTHERN RAILWAY COMPANY, and CONSOLIDATED RAIL CORPORATION, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, Owen Haynes ("Mr. Haynes" or "Plaintiff"), brings this action against Defendants CSX Transportation, Inc. ("CSXT"), Norfolk Southern Railway Company ("NSR"), and Consolidated Rail Corporation ("CRC") (collectively, "Defendants"), on behalf of himself and all others similarly situated, and alleges upon information and belief, except as to his own

1

actions, the investigation of his counsel and the facts that are a matter of public record, as follows:

## INTRODUCTION

1. Plaintiff brings this action to obtain damages and other relief from Defendants, individually and on behalf of the class defined herein ("Class").

2. This action is brought to address the significant financial damages suffered by commercial businesses and individuals resulting from the November 30, 2012 derailment of a train operated by Defendants as it crossed a railroad bridge in Paulsboro, New Jersey. As a result of the derailment, extremely hazardous substances were released into the atmosphere, resulting in the evacuation of the area, the closing of businesses or their operation on a severely limited basis, and substantial revenue losses to businesses and individuals over the following weeks.

3. Plaintiff asserts claims on behalf of himself and the Class for negligence and under principles of strict liability.

## THE PARTIES

4. Plaintiff is, and at all times relevant to this action has been, a citizen of the State of New Jersey and a resident of Paulsboro, New Jersey.

5. Defendant CSXT is a Virginia corporation with its principal place of business at 500 Water Street, Jacksonville, Florida. CSXT is a wholly-owned subsidiary of CSX Corporation.

6. Defendant NSR is a Virginia corporation with its principal place of business at Three Commercial Place, Norfolk, Virginia. Defendant NSR is a wholly-owned subsidiary of Norfolk Southern Corporation.

7. Defendant CRC is a Pennsylvania corporation with its principal place of business at 1717 Arch Street, Philadelphia, Pennsylvania. CRC is a wholly owned subsidiary of Conrail Inc., which in turn is a jointly-owned subsidiary of Norfolk Southern Corporation and CSX Corporation.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interests and costs, and this matter is a class action in which Plaintiff and Class members are citizens of states other than those of Defendants.

9.  Venue is proper in this district pursuant to 28 U.S.C. § 1391, because Defendants do substantial business in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## AGENCY ALLEGATIONS

10.  Defendants, their subsidiaries, employees and any others carrying out the wrongs alleged in this Complaint (and each of them) were the agents, servants, employees, successors, assignees, transferees, and/or joint venturers of each other, and each was, as such, acting within the course, scope and authority of said agency, employment and/or joint venture and was acting with the consent, permission and authorization of the other Defendants.

## SUBSTANTIVE ALLEGATIONS

### The November 30, 2012 Derailment And Its Aftermath

11.  Around 7 o'clock in the morning of Friday, November 30, 2012, shortly after it left the Pavonia Railyard in Camden, New Jersey, an 84-car CRC westbound freight train approached a bridge spanning the Mantua Creek, a Delaware River tributary, near East Jefferson Street in Paulsboro, Gloucester County, New Jersey (the "Bridge"). The Bridge is owned, operated and maintained by Defendants.

12.  As the train reached the Bridge, the two locomotives and first six cars passed safely, but the next seven train cars - the first (Car No. ECUX 881493) carrying lumber, the second (No. SGLR 006298) plastic pellets, the third (UTLX 207398) 23,000 gallons of ethanol, and the last four (Nos. OCPX 80323, OCPX 80234, UTLX 098097, and UTLX 098041) each containing between 176,000 and 180,000 pounds of vinyl chloride ("VCL") - derailed.

13. As the cars derailed, the Bridge began to collapse, sending the third through sixth derailed cars into the creek. The fifth derailed car (No. OCPX 80234), containing 176,000 pounds of VCL, punctured as it plunged from the Bridge, sending hazardous chemicals into the creek and hazardous gas into the air. At present, it is not known whether other hazardous materials leaked into the creek from other damaged rail cars.

14. VCL is a colorless gas. According to the United States Environmental Protection Agency ("EPA"), short-term exposure to high levels of VCL in the air can result in serious central nervous system effects in humans, including dizziness and even death. The EPA lists VCL on its air toxics web site as a Group A human carcinogen used to make polyvinyl chloride ("PVC") plastic and vinyl products. It is "extremely flammable" in a fire and can cause frostbite on contact, according to the National Institute for Occupational Safety & Health. VCL is heavier than air, and as a result can travel along the ground, adding to the danger it poses.

15. Rescue units were dispatched to the scene after many people in the Paulsboro area complained of respiratory problems. Eleven people were taken from the scene and more than seventy others went to Underwood Memorial Hospital in nearby Woodbury, New Jersey for treatment.

16. Approximately 27 blocks around the derailment scene were evacuated, and the remaining sections of the 2.2 square mile borough were placed on "shelter-in-place" orders for several days, along with the neighboring municipalities of West Deptford and East Greenwich. All major roadways leading into Paulsboro were closed.

17. The US Coast Guard was notified that the chemical might have leaked into the nearby Delaware River. Booms were placed in the creek as a precaution to contain the 180,000 pounds of hazardous material that leaked.

18. As a direct result of the derailment, the release of VCL into the atmosphere, the evacuation orders, and the reality of the dangerousness of the situation, commerce in Paulsboro and nearby areas came to a halt. Retail businesses had no customers, and other businesses could

not get their employees to their facilities. Many businesses lost thousands or tens of thousands of dollars over the ensuing weeks, as, even after the trains were removed, consumers understandably remained unwilling to venture into Paulsboro and the surrounding area for fear of the potential health consequences. Nothing that local businesses could do altered this reality.

19. New Jersey Department of Environmental Protection officials later advised the public that "[i]t appears that all of the vinyl chloride that was in the particular car has dissipated," and that "[t]here's no more release going on." However, these words offered small comfort for residents or businesses in the area, and officials noted that they were going to try to pump VCL out of at least one of the remaining derailed cars. Indeed, these same officials who proclaimed the end of the release noted that there was a risk that some additional chemical could be released into the air when the train is moved.

### The Jefferson Street Bridge's History

20. The Bridge was built by the Pennsylvania Railroad Company in 1873. It is a "swing bridge" that operates like a garden fence, with a section that swings sideways to open for boat traffic, then closes and locks into place to accommodate freight trains. From March through November, the Bridge's "default" position is to be open to boats. To allow their train to cross the Bridge, the operator must punch in a radio code to make the Bridge close (the Bridge has only a single track).

21. The Bridge is heavily used, particularly for transporting hazardous materials. As National Transportation Safety Board ("NTSB") Chairman Deborah Hersman said at a news conference following the derailment, "This is a very complex [bridge] operation. There is a lot of tonnage that goes over this bridge and a lot of hazardous materials."

22. The Bridge is owned and maintained by CRC, CSX, and NSR. Notwithstanding its complexity, and its role in the transportation of hazardous waste in a highly populated area, its recent history is full of unheeded warnings.

23. In August 2009, 16 rail cars carrying coal derailed on the Bridge. According to

5

forms filled out at the time by CRC and NSR, the cause of the 2009 derailment was "misalignment." The Bridge was repaired and rebuilt, and reopened in 2010.

24. According to the NTSB, during the year prior to the derailment Defendants had received 23 "trouble tickets" about problems with the Bridge. While some of these problems were minor, several were significant, including two concerning problems with the Bridge's signals or track alignment. Nine trouble tickets were issued between October 27 and November 29, 2012.

25. On November 19, 2012, a rail crew reported to the Defendants that the Bridge had experienced a misalignment problem.

26. The Bridge signal system is designed so that a green signal shows, allowing the train to proceed when the Bridge is in proper position with the track properly aligned and locked in place. Conversely, a red signal indicates that the Bridge is not properly aligned, or the track on the Bridge is not properly locked to the track adjoining the Bridge. At 3:15 a.m. Thursday, November 29, 2012, one of Defendants' crews found that rails on the Bridge were about 4 inches out of alignment. According to the NTSB, the crew had to make several tries at punching in the radio code before it worked properly and the Bridge's four sliding lock mechanisms were fully and properly engaged and the signal finally turned green, allowing the crew to cross the Bridge. The NTSB confirmed that the crew spent about two hours that day working on the Bridge and its alignment problem.

27. Four trains crossed the Bridge throughout the remainder of November 29. The last train crossed the Bridge at 11:15 p.m. without any problems, but a few minutes after the crossing the train crew received an automated voice message from the Bridge's control system stating that "Bridge Failed To Operate." The NTSB confirmed that this message could have meant that the Bridge did not fully reopen after the train passed.

28. The next train to cross the Bridge was the 84-car CRC westbound freight train around 7 o'clock Friday morning. As the train approached the Bridge, it encountered a red signal

6

light. The train's engineer entered the radio code several times, but the signal did not turn green to indicate the Bridge was safe to cross. The engineer looked at the Bridge, decided it looked passable, and called a CRC dispatcher and asked for permission to cross despite the red light. Despite the presence of an unexplained red light, and the recent history of serious alignment problems indicated by the presence of a red light as recently as the day before, the dispatcher granted permission, and as a result, the derailment occurred.

29. Prior to this accident, the Defendants had employed a human operator whose job was to move the Bridge into the proper position, lock the Bridge to the tracks on either side of it, and inspect to make certain that the Bridge was properly aligned and locked with the adjacent rails before any train was permitted to move over the Bridge.

30. Prior to the accident, Defendants eliminated the human bridge operator position and replaced the human bridge operator with the electronic and mechanical system described above.

### The Representative Plaintiff's Facts

31. Mr. Haynes owns a rental house in Paulsboro, within the area that was evacuated after the derailment. As a result of the derailment and evacuation, Plaintiff's tenant, who had lived in Mr. Haynes' house for a number of years, became concerned about her health and the health of the children living with her and moved out of the house, advising Mr. Haynes that she would not return. To date, Plaintiff has been unable to rent out the house.

32. Further, Mr. Haynes is planning to sell this and one other house he owns within the evacuation zone during 2013. As a result of the derailment, property values have been significantly, and negatively, affected, such that Mr. Haynes can expect to receive significantly less when he sells than he would have received absent the derailment and its effects.

### CLASS ACTION ALLEGATIONS

33. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of himself and the following Class:

>All businesses and individuals that lost revenue or income as a result of the November 30, 2012 CRC derailment at the East Jefferson Street Bridge in Paulsboro, New Jersey.

Excluded from the Class are Defendants and their affiliates, employees, officers and directors and the Judge to whom this case is assigned. Also excluded from the Class are any claims for damages relating to personal injuries. Plaintiff reserves the right to amend the definition of the Class if discovery and/or further investigation reveals that the Class should be expanded or otherwise modified.

34. <u>Numerosity/Impracticability of Joinder</u>: The members of the Class are so numerous that joinder of all members would be impracticable. Plaintiff reasonably estimates that there are at least several hundred Class members. The members of the Class are readily identifiable and the disposition of these claims will provide substantial benefits to the Class members.

35. <u>Commonality and Predominance</u>: There is a well-defined community of interest and common questions of law and fact which predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from one Class member to another, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited, to the following:

    a. Whether Defendants were the cause of the November 30, 2012 derailment;

    b. Whether Defendants are strictly liable for the November 30, 2012 derailment;

    c. Whether Defendants were negligent in allowing the November 30, 2012 derailment to occur;

    d. Whether Plaintiff and Class members have been damaged by the November 30, 2012 derailment; and

    e. Whether Defendants' conduct was outrageous such that the imposition of

punitive damages is warranted.

36. <u>Typicality</u>: The representative Plaintiff's claims are typical of the claims of the Class, because Plaintiff and all Class members were injured by the same wrongful practices in which Defendants engaged. Plaintiff's claims arise from the same practice and course of conduct that give rise to the claims of Class members, and are based on the same or similar legal theories. The only difference could be the amount of damages sustained, which can be determined readily, and does not bar class certification.

37. <u>Adequacy</u>: Plaintiff is a representative who will fully and adequately protect the interests of the members of the Class, and has retained Class Counsel who are experienced and qualified in prosecuting class actions, including complex class actions in New Jersey and throughout the country. Neither Plaintiff nor his counsel have interests which are contrary to or conflicting with those of the Class.

38. <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia,* the following reasons:

   a. It is economically impractical for members of the Class to prosecute individual actions;

   b. The Class is readily definable;

   c. Prosecution as a class action will eliminate the possibility of repetitious litigation; and

   d. A class action will enable claims to be handled in an orderly and expeditious manner. Furthermore, a class action will save time and expense and will ensure uniformity of decisions.

39. Plaintiff does not anticipate any difficulty in the management of this litigation.

### FIRST CAUSE OF ACTION
### (Negligence)

40. Plaintiff repeats and realleges the allegations of the preceding paragraphs as if

9

fully set forth herein.

41. The November 30, 2012 derailment was caused by the joint and several negligence of the Defendants, including but not limited to the following:

    a. Failing to properly inspect the Bridge;

    b. Failing to properly discover the defective, malfunctioning and unsafe condition of the Bridge;

    c. Failing to repair the Bridge;

    d. Failing to properly maintain the Bridge;

    e. Ignoring prior complaints that the Bridge failed to operate properly, failed to properly align and failed to properly lock;

    f. Ignoring the findings of other crews in the days and hours before this derailment that the Bridge failed to properly operate and that the track regularly failed to align and lock;

    g. Permitting a train to cross the Bridge even though there was a red signal that indicated that the Bridge was not properly aligned or locked;

    h. Failing to have properly trained personnel inspect the Bridge and its track before permitting the train to cross over it despite a red signal;

    i. Failure to have a human bridge operator who was trained to operate the Bridge and to inspect it prior to any train travel over it;

    j. Failing to perform required quarterly inspection of the Bridge;

    k. Permitting hazardous, toxic, and extremely dangerous and poisonous substances to be transported across the Bridge despite the presence of a red signal indicating that the Bridge was not properly aligned or locked;

    l. Failing to take necessary and proper precautions for the safety of those individuals living, working, and otherwise situated in the vicinity of the Bridge;

    m. Failing to warn those individuals living, working, and otherwise situated

near the Bridge that a hazardous substance was being transported across the Bridge despite the facts that the Defendants knew or should have known that it was unsafe to operate a train across the Bridge under the circumstances existing on the morning of November 30, 2012;

    n. Violating statutes of the United States of America and the State of New Jersey, and regulations of federal and state departments and agencies with respect to the Bridge and the movement of train traffic across it;

    o. Failure to take necessary precautions despite engaging in an ultra-hazardous activity;

    p. Failure to properly inspect, maintain and repair the Bridge's signal system;

    q. Failure to comply with Defendants' own safety, operating and other rules, procedures and regulations;

    r. Failure to comply with Northeast Operating Rules Advisory Committee ("NORAC") rules;

    s. Failure to have a qualified bridge mechanic or engineer, signal maintainer or signal department personnel, or maintenance-of-way personnel inspect the Bridge and the tracks before permitting the train to travel over the Bridge despite the red signal; and

    t. Permitting untrained and unqualified personnel to make the decision to proceed over the Bridge despite the presence of the red signal.

42. As a result of Defendants' negligence, carelessness, and recklessness, Plaintiff and the Class suffered damages to their business operations and/or lost income.

43. At all times relevant to this action, Defendants owed Plaintiff and members of the Class a duty of care to operate the Bridge in a safe and secure manner and to ensure that hazardous material was not discharged to the detriment of Plaintiff and the Class.

44. By the conduct described herein, including the derailment, Defendants breached their duty to Plaintiff and members of the Class.

45. As a result of Defendants' breach of duty, Plaintiff and members of the Class were

damaged. The damages sustained by Plaintiff and members of the Class were proximately caused by Defendants' breach of duty.

46. Defendants' conduct, as described herein, was malicious, wilful, wanton and outrageous, particularly in light of the prior derailment in 2009 and the numerous safety violations and underlying problems during the past several years, such that the imposition of punitive damages is warranted.

47. As a result of the nature of the derailment and release of VCL, the doctrine of *res ipsa loquitur* is applicable because the derailment itself bespeaks negligence, the instrumentality causing the injury was within Defendants' exclusive control, and under the circumstances the injury was not the result of a voluntary act of negligence by Plaintiff and members of the Class.

48. Plaintiff and Class members are entitled to compensatory and punitive damages as a result of Defendants' negligence.

## SECOND CAUSE OF ACTION
### (Strict Liability)

49. Defendants' conduct, as described herein, was malicious, wilful, wanton and outrageous, particularly in light of the prior derailment in August 2009 and the numerous violations that the Defendants have been cited for in connection with their operation of the Bridge during the past several years, such that the imposition of punitive damages is warranted.

50. Defendants' activities in connection with the substantial shipping of hazardous materials across the Bridge are *de facto* abnormally dangerous activities, which give rise to absolute or strict liability.

51. As a result of the nuisance created by Defendants, Plaintiff and Class members are entitled to compensatory and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1. For an order certifying this action as a class action, appointing Plaintiff as the

12

representative of the Class and appointing his attorneys as Class Counsel;

2. For compensatory damages on all applicable claims, in an amount to be proven at trial;

3. For punitive damages;

4. For an award of attorneys' fees, costs and expenses; and

5. For such other and further relief, including equitable and injunctive relief, that the Court deems appropriate and just under all of the circumstances.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

Dated: January 22, 2013

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

By:     /s/ James C. Shah
James C. Shah
Natalie Finkelman Bennett
475 White Horse Pike
Collingswood, NJ 08017-1909
Telephone: 856/858-1770
Facsimile: 856/858-7012
jshah@sfmslaw.com
nfinkelman@sfmslaw.com

John W. Trimble, Jr.
**TRIMBLE & ARMANO**
Washington Professional Campus
900 Route 168, Suite B1
Turnersville, NJ 08012-1453
Telephone: 856/232-9500
Facsimile: 856/232-9698
john.trimble@trimbleandassociates.com

Scott R. Shepherd
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
35 East State Street
Media, PA 19063
Telephone: 610/891-9880
Facsimile: 610/891-9883
sshepherd@sfmslaw.com

Counsel for Plaintiff and the Class